UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAIMLERCHRYSLER MOTORS COMPANY, L.L.C.,
a Delaware limited liability company,

        Plaintiff/Counter-Defendant,

                                          Case No. 03-CV-72265
vs.                                      HON. GEORGE CARAM STEEH

BILL DAVIS RACING, INC.,
a North Carolina company,

        Defendant.

_____/

ORDER DENYING PLAINTIFF DAIMLERCHRYSLER'S MOTION FOR
FOR PARTIAL SUMMARY JUDGMENT (#53);
AND GRANTING IN PART, AND DENYING IN PART,
DEFENDANT BDR'S MOTION FOR SUMMARY JUDGMENT (#52)

        This matter is before the court on plaintiff DaimlerChrysler Motors Company, L.L.C.'s ("D/C") and defendant Bill Davis Racing, Inc.'s ("BDR") cross-motions for summary judgment as to plaintiff D/C's breach of contract and injunctive relief claims, and defendant BDR's breach of contract counterclaim.   A hearing on the motions was held on May 23, 2005.   For the reasons set forth below, D/C's motion for partial summary judgment will be DENIED.   BDR's motion for summary judgment will be GRANTED, IN PART, to the extent D/C's breach of contract claim is premised upon a breach of Section 10.2 of the parties' February 14, 2000 Motorsport Racing Agreement ("MR Agreement").   BDR's motion for summary judgment will be DENIED, IN PART, as to D/C's breach of contract claim premised upon a breach of Section 12.1 of the MR Agreement, D/C's injunctive relief claim,

and BDR's breach of contract counterclaim.

## I. Background

Plaintiff D/C filed a complaint in Michigan's Oakland County Circuit Court on May 22, 2003 alleging the parties executed the six-year February 14, 2000 MR Agreement, wherein BDR agreed to provide technical services to D/C for the purpose of NASCAR[1] racing. BDR allegedly agreed not to drive or promote competitor's vehicles, not to disclose any acquired information without D/C's prior written approval, and to retain confidential information for three years. D/C alleges that, contrary to the MR Agreement, BDR acquired a license in December 2002 to conduct business at a North Carolina facility equipped with a "Tundra Race Truck Center" sign, and later represented D/C competitor Toyota at an April 30, 2003 NASCAR wind-tunnel test conducted at a Lockheed-Martin facility in Marietta, Georgia, where a Toyota Tundra truck was being tested.[2] D/C alleges that the Toyota truck was equipped with a D/C Dodge engine, and that BDR's decals appeared on the wheel rims and inside the vehicle. Count I sought a declaratory judgment that BDR could lawfully terminate the MR Agreement. Count II alleges breach of contract. Count III seeks injunctive relief regarding confidential information.

The lawsuit was removed to federal court on June 12, 2003 based on federal diversity jurisdiction under 28 U.S.C. § 1332. BDR filed a counterclaim on June 30, 2003, alleging D/C breached the MR Agreement on May 22, 2003, the same day D/C filed suit, by terminating the MR Agreement "effective immediately" in a letter authored by D/C Senior

---

[1]  National Association of Stock Car Auto Racing, Inc..

[2]  The truck was blown off its moorings during the test, damaging non-party Lockheed's wind-tunnel. See Plaintiff's Exhibit 7.

Manager Robert Wildberger.  BDR alleges the reasons advanced in Wildberger's letter did not justify termination of the contract.  On August 14, 2003, D/C's declaratory judgment claim was dismissed as moot consistent with the parties' agreement that the MR Agreement was terminated by D/C on May 22, 2003.  D/C's breach of contract and injunctive relief claims, and BDR's breach of contract counterclaim, remain to be adjudicated, and are the subjects of the cross-motions for summary judgment.

## II. MR Agreement

NASCAR is the largest sanctioning body of professional motorsports in the United States, with its three largest racing series being the Winston Cup Series (renamed the Nextel Cup Series in 2004), the Busch Series, and the Craftsman Truck Series.  See http://www.wikimirror.com/Nascar.  The MR Agreement reads in pertinent part:

> This MOTORSPORT RACING AGREEMENT (the "Agreement") is made and entered into as of the 14th day of February, 2000, by and between DAIMLER CHRYSLER MOTORS CORPORATION, a Delaware corporation and its affiliates, subsidiaries and related companies ("DaimlerChrysler"), and Bill Davis Racing Incorporated ("RACE TEAM"), a North Carolina company.
>
> WITNESSETH
>
> WHEREAS, RACE TEAM has considerable experience in professional motorsport racing; and,
>
> WHEREAS, DaimlerChrysler desires to increase its public exposure through the sponsorship of professional racing teams in motorsport racing; and,
>
> WHEREAS, RACE TEAM will prepare DaimlerChrysler vehicles for professional motorsport racing events and compete in such events; and,
>
> WHEREAS, DaimlerChrysler will pay RACE TEAM a fee and provide engineering and parts support.
>
> NOW THEREFORE, in consideration of the promises and covenants herein contained, the parties hereto agree as follows:

3

1.  <u>DEFINITIONS</u>

1.1  "Additional Races" means any motorsports races other than Scheduled Races for which DaimlerChrysler has expressly authorized RACE TEAM'S participation.

\*       \*       \*

1.3  "Employees" means the Driver and all employees of the RACE TEAM.

1.4 "Performance Driving" means noncompetitive exhibition or demonstration driving for dealer shows, media presentations and similar events.

1.5  "Race Series" means the NASCAR Winston Cup racing series held annually and sanctioned by the NASCAR race association.  During any renewal of this Agreement pursuant to Section 19, Race Series shall mean the NASCAR Winston Cup racing series sanctioned by the NASCAR race association.

1.6  "Race Team" means the Race Team's drivers, mechanics and related personnel responsible for the Race Vehicles entering and performing in the Race Series, Scheduled Races and Additional Races.

1.7  "Race Vehicles" means the following vehicles which are to be operated by the RACE TEAM:

Two Dodge Intrepids and such back-up vehicles, (the "Back-Up Vehicles") as required to satisfactorily support a 2 car entry race effort.  The Race Vehicles will be manufactured to resemble the then current model of the Dodge Intrepid.
Team A  the # 22 car (currently driven by Ward Burton)
Team B  the # 93 car (currently driven by Dave Blaney)

\*       \*       \*

1.9 "Scheduled Races" means the Race Series association's motorsports races which, as of the Effective Date of this Agreement, have been approved by DaimlerChrysler for the RACE TEAM's participation.  Each of the Scheduled Races shall be referred to as a "Scheduled Race."

\*       \*       \*

3. <u>RACE TEAMS VEHICLE PREPARATION AND OPERATION</u>

3.1  RACE TEAM will perform engineering, manufacturing and assembly

4

services as required to modify, prepare and test the Race Vehicles for Scheduled Races and Additional Races in accordance with the Race Series association's rules and regulations.

3.2  RACE TEAM will use the Race Vehicles for competitive participation in the Scheduled Races, Additional Races and for Performance Driving, Rigorous Driving, and other exhibitions, pursuant to Section 7.

*        *        *

## 4.  RACING EVENTS

4.1  RACE TEAM will participate in all Scheduled Races.

*        *        *

## 7.  APPEARANCES

7.1    DaimlerChrysler may, upon reasonable notice, request personal appearances by the Driver, team owner and crew chief.  DaimlerChrysler will make no direct payment to the Driver or crew chief, but will pay RACE TEAM for such personal appearances.  DaimlerChrysler will compensate the owner, driver, and crew chiefs at the following rates for each personal appearance requested during the first three years of the agreement [see rates below]. For the last two years of the agreement, this compensation will be renegotiated to reflect market rates.

7.1.1
Shows, Seminars and Similar Events:

Driver Appearance: $15,000 for up to 3 hours, excluding travel.

Owner Appearance:  $7,500 for up to 3 hours, excluding travel, unless it is a corporate DaimlerChrysler appearance, in which case the appearance will be made for no charge.

Crew Chief Appearance: $3,500 for up to 3 hours, excluding travel.

• indicates no charge for corporate DaimlerChrysler appearance.

7.1.2  Performance Driving:
Driver Appearance $15,000 per day

7.1.3  Rigorous Driving:
Driver Appearance $15,000 per day

5

7.2   The Driver and crew chief will each provide 3 (three) free non-race related appearances annually at DaimlerChrysler's request, receiving no appearance fees other than expenses as covered in section 7.1.   At DaimlerChrysler's discretion, up to 2 (two) of these appearances may be for filming/development of advertising commercials.   Public relations appearances, subject to mutual consent, for media purposes, are at no charge to DaimlerChrysler.  Appearances at race event locations will be at no charge to DaimlerChrysler.  They will be for a maximum of 30 minutes unless otherwise agreed to by the parties and subject to favorable schedules. Two (2) of the three appearances may be for extended duration of up to six (6) hours excluding travel.

\*          \*          \*

10.  COMPETITIVE VEHICLES

10.1  During the term of this Agreement, RACE TEAM will cause Driver to refrain from driving any non-DaimlerChrysler vehicles in any race show, exhibition, or similar event without obtaining DaimlerChrysler's prior written consent.

10.2   During the term of this Agreement, neither RACE TEAM nor its Employees will represent, endorse, or otherwise promote the vehicles, parts or service of a DaimlerChrysler competitor, unless RACE TEAM obtains DaimlerChrysler's  prior written consent.

\*          \*          \*

11.  ADVERTISING

11.1 RACE TEAM will cooperate, and RACE TEAM will cause RACE TEAM's Employees and independent contractors to cooperate with all reasonable requests of DaimlerChrysler concerning advertising.  . . . .

\*          \*          \*

11.4   RACE TEAM will refrain, and RACE TEAM will cause its employees and independent contractors, if any, to refrain from any public statement that (1) is in derogation of DaimlerChrysler or its products and/or (2) tends to place DaimlerChrysler in a false or unfavorable light.

\*          \*          \*

12.  CONFIDENTIALITY .

6

12.1 RACE TEAM will not disclose to any other person, firm, corporation or association whatsoever, other than to DaimlerChrysler or those designated by DaimlerChrysler, any design, development, improvement, discovery, invention or any information made, acquired or originated by RACE TEAM or DaimlerChrysler in connection with this Agreement unless release of such information to a third party is first approved by DaimlerChrysler in writing or such information is released as part of an ongoing project approved by DaimlerChrysler.  If such approval is granted by DaimlerChrysler, RACE TEAM will ensure that the third party will safeguard the confidentiality of such material.

*          *          *

12.3  Unless otherwise authorized by the disclosing party, the receiving party agrees to retain the Confidential information in confidence for a period of three (3) years from the date of receipt thereof by exercising reasonable precautions to prevent disclosure of the received Confidential Information to any party not a signatory to this Agreement, and not to use the received Confidential Information for any purpose other than the aforesaid purposes. The standard of care imposed on each party for protecting Confidential Information received from another party will be that degree of care that the party uses to protect against disclosure, publication, or dissemination of its own proprietary information of like importance.

12.4 Notwithstanding any other provision of this Agreement, each party acknowledges that the obligation for a receiving party to keep Confidential Information shall not include any information which:

(a) is already known to the receiving party at the time of disclosure, or becomes publicly known through no wrongful act on the receiving party's part;

(b) is rightfully received by the receiving party from a third party not a party to this Agreement without breach of this Agreement;

(c)  is independently developed by the receiving party without breach of this agreement;

(d) is furnished to a party not a signatory to this Agreement by the disclosing party without a similar restriction on the receiving party's rights; or

(e) is explicitly approved for release by written authorization of the disclosing party.

*          *          *

7

18.  <u>TERMINATION</u>

18.1  (a)  During the first term of this Agreement, DaimlerChrysler may terminate this Agreement immediately, if, in DaimlerChrysler's sole opinion, Bill Davis, after having been given written notice by DaimlerChrysler, has been or will be unable to manage the RACE TEAM for a continuous period of more than 5 months.

\*          \*          \*

18.6  DaimlerChrysler and the RACE TEAM agree that the rights provided to DaimlerChrysler in Section 18 of this Agreement are in addition to, and do not limit, the rights of either party under applicable law.

\*          \*          \*

25.  <u>ADDITIONAL PROVISIONS</u>

\*          \*          \*

25.3  <u>Captions</u> - Captions to Sections in this Agreement have been inserted solely for the sake of convenient reference and are without any substantive effect.

26.  <u>GOVERNING LAW</u>

This Agreement will be governed and construed in accordance with the laws of the State of Michigan, without regard to its conflict of law provisions and as if this Agreement had been fully performed therein.   RACE TEAM consents to the jurisdiction of the Michigan State Courts and the United States Courts located in the State of Michigan and to service of process in any manner permitted by the laws of the State of Michigan or the United States of America applicable to the court in which such action is brought.

27.  <u>ENTIRE AGREEMENT</u>

This Agreement, together with the attached Schedules, constitutes the entire agreement and understanding between the parties and cancels and supercedes all prior understandings, whether verbal or written, with respect to the subject matter hereof; any other agreements or understandings are hereby revoked.  This Agreement may be altered, amended or modified or any provision may be waived only by a written instrument signed by an authorized representative of each party.

The parties dispute the scope of the MR Agreement, and as a result, whether BDR's

alleged involvement with Toyota constituted a breach of the properly construed MR Agreement.

Specifically, BDR argues that any assistance it provided to Toyota in building a Craftsman Truck Series prototype truck did not breach the MR Agreement because the MR Agreement is limited in scope to only Winston Cup racing, and D/C's Winston Cup Series competitors. BDR urges that the definition of "Race Team" found in Section 1.6 includes only BDR personnel associated with Winston Cup Series races, not BDR personnel associated with other races such as Craftsman Truck Series races, and therefore BDR personnel not associated with Winston Cup racing were not subject to the restrictive provisions of Section 10.2. BDR asserts it is undisputed that Toyota was not involved in Winston Cup racing prior to D/C's termination of the MR Agreement, and was therefore not a D/C "competitor" for purposes of the MR Agreement. BDR continues by noting that, with D/C's knowledge, BDR provided support to Busch Series racing participant General Motors Corporation ("GM") during the term of the MR Agreement, without D/C's written consent as would have been required under Section 10.2 if GM was considered a "competitor" under the MR Agreement. BDR argues that Section 10.2 of the MR Agreement is further limited in scope as only preluding BDR from *publicly* representing, endorsing, or otherwise promoting Winston Cup Series competitors' vehicles, parts, or services, permitting BDR to *privately* provide fabricating, engineering, testing, and other technical services to Busch Series and Craftsman Truck Series participants such as Toyota. BDR maintains that any technical services it provided to Toyota were provided in restricted, non-public forums. BDR proffers a December 30, 1999 Memorandum of Understanding ("MOU") signed by the parties as evidence that the MR Agreement was intended to address only public advertising

9

and merchandising.  BDR also maintains it assisted Toyota in building a common prototype truck to be used by all Craftsman Truck Series competitors, consistent with NASCAR regulations requiring competitors to share certain technical information and make parts available among each other for inspection and purchase.  BDR asserts that D/C's claim for injunctive relief fails as a matter of law absent evidence that BDR ever disclosed any confidential information, or evidence that D/C enjoys a substantial likelihood of succeeding on the merits of its breach of contract claim.

D/C argues in support of its own motion for partial summary judgment of its breach of contract claim, as to liability only, that Section 10.2 of the MR Agreement unambiguously prohibits BDR from representing, endorsing, or otherwise promoting any "DaimlerChrysler competitor" such as Toyota, and is not limited to only Winston Cup Series competitors.  D/C asserts that Section 10.2 contains no distinction between public or private representations, endorsements, or promotions.  To the contrary, D/C maintains that Section 7, governing "APPEARANCES," and Section 11, governing "ADVERTISING," address the parties' contractual rights and duties relative to publicity and public disclosures.  D/C also argues that, even construing the MR Agreement as precluding only public representations, endorsements, or promotions, it is beyond dispute that BDR publicly represented and endorsed Toyota at BDR's North Carolina "Tundra Race Truck Center" facility, at the April 30, 2003 wind-tunnel test where a BDR engineer wore a "Toyota Racing Development" shirt, and in building two Toyota "marketing" trucks for display at the 2003 Chicago Auto Show and 2003 Daytona 500.  D/C also proffers evidence to support its claim that BDR disclosed confidential technical information to Toyota, including Dodge engine data.

### III. Standard of Review

10

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001). If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

## V. Analysis

### A. Contractual Interpretation

11

This court must apply Michigan's conflict of law rules. See Banek Inc. v. Yogurt Ventures U.S.A., Inc., 6 F.3d 357, 361 (6th Cir. 1993). The parties agree Michigan law is controlling, consistent with Section 26 of the MR Agreement. This court will apply Michigan law. See Wonderland Shopping Center Venture Ltd. Partnership v. CDC Mortgage Capital, Inc., 274 F.3d 1085, 1092 (6th Cir. 2001); Equitable Life Assurance Society of the United States v. Poe, 143 F.3d 1013, 1016 (6th Cir. 1998); Chrysler Corporation v. Skyline Indus. Serv., Inc., 448 Mich. 113, 120, 120 n.14, 125, 528 N.W.2d 698 (1995).

A court's obligation in interpreting a written contract is to discern the contracting parties' intent. Quality Products and Concepts Co. v. Nagel Precision, Inc., 469 Mich. 362, 375, 666 N.W.2d 251 (2003) (citing Sobczak v. Kotwicki, 347 Mich. 242, 249, 79 N.W.2d 471 (1956)). This intent is to be determined in light of the surrounding circumstances and from a reading of the instrument as a whole. Cleveland v. Detroit Trust Co., 264 Mich. 253, 257, 249 N.W.2d 842 (1933). If the contract language is clear and unambiguous, the contract is construed as a matter of law and enforced as written unless contrary to public policy. Quality Products, 469 Mich. at 375 (citing Farm Bureau Mut. Ins. Co. of Michigan v. Nikkel, 460 Mich. 558, 570, 596 N.W.2d 915 (1999)); Port Huron Ed. Ass'n v. Port Huron Area School Dist., 452 Mich. 309, 323, 550 N.W.2d 228 (1996) (citing Dykema v. Muskegon Piston Ring Co., 348 Mich. 129, 138, 82 N.W.2d 467 (1957)). "Contractual language is construed according to its plain and ordinary meaning, and technical or constrained constructions are to be avoided." UAW-GM Human Resource Center v. KSL Recreation Corp., 228 Mich. App. 486, 491-492, 579 N.W.2d 422 (1998) (quoting Dillon v. DeNooyer Chevrolet Geo, 217 Mich. App. 163, 166, 550 N.W.2d 846 (1996)). Extrinsic evidence may be used "to dispose of a potential ambiguity, to prove the existence of a

12

potential ambiguity, or to indicate the actual intent of the parties where an actual ambiguity exists."  Wonderland Shopping Center, 274 F.3d at 1095 (citing Am. Anodco, Inc, v. Reynolds Metals Co., 743 F.2d 417, 422 (6th Cir. 1984)).  If the contract language remains unclear or susceptible to more than one meaning, contract interpretation becomes a question of fact that must be decided by the fact-finder upon an examination of the extrinsic evidence.  Port Huron Ed. Ass'n, 452 Mich. at 323; Klapp v. United Insurance Group Agency, Inc., 468 Mich. 459, 453-454, 663 N.W.2d 447 (2003).

### i. Section 10.2 of the MR Agreement

The preamble to the MR Agreement states D/C's general intent to "increase its public exposure through the sponsorship of professional teams in motorsport racing events," and BDR's general intent to "prepare DaimlerChrysler vehicles for professional motorsports racing events and compete in such events."  To that end, BDR promised in Section 4.1 to "participate in all Scheduled Races."  "Scheduled Races" are defined in Section 1.9 to mean "the Race Series association's motorsports races," with "Race Series" expressly defined in Section 1.5 as "the NASCAR Winston Cup racing series held annually and sanctioned by the NASCAR race association."  A simple combination of terms yields BDR's promise to participate in the NASCAR Winston Cup Series.

BDR also promised in Section 3.2 to "use the Race Vehicles for competitive participation in . . . Additional Races," with "Additional Races" defined in Section 1.1 as "any motorsports races other than Scheduled Races for which DaimlerChrysler has expressly authorized RACE TEAM's participation."  Again, a simple combination of terms yields BDR's promise to use the "Race Vehicles" "for competitive participation" in motorsports races other than NASCAR Winston Cup Series races, upon receiving D/C's

13

express authorization.

BDR further promised in Section 3.2 to "use the Race Vehicles . . . for Performance Driving, Rigorous Driving, and other exhibitions, pursuant to Section 7."  "Performance Driving" as defined under Section 1.4 means "noncompetitive exhibition or demonstration driving," while "Rigorous Driving" as defined under Section 1.8 means "testing vehicles non-competitively under simulated driving conditions."  Section 7, as referred to in Section 3.2, speaks to "personal appearances by the Driver, team owner, and crew chief" at "Shows, Seminars and Similar Events," requiring the Driver and crew chief to "provide 3 (three) free non-race related appearances annually[.]"  The MR Agreement expressly required BDR to participate in noncompetitive, non-race related events.

The plain and ordinary meaning of the above Sections of the MR Agreement provides the parties' clear intent that: (1) BDR was required to compete in Winston Cup Series racing events; (2) BDR could be required to compete in racing events other than Winston Cup Series races upon receiving D/C's express authorization, and; (3) BDR was required to participate in noncompetitive events. With the MR Agreement language clearly distinguishing BDR's contractual obligation to participate in both competitive races and noncompetitive events, Section 10.2 provides:

> 10.2   During the term of this Agreement, neither RACE TEAM nor its Employees will represent, endorse, or otherwise promote the vehicles, parts or service of a DaimlerChrysler competitor, unless RACE TEAM obtains DaimlerChrysler's prior written consent.

Construing the MR Agreement as a whole, the court finds as a matter of law that the term "competitor" as used in Section 10.2 plainly and unambiguously refers to D/C's racing competitors, not all of D/C's business competitors as argued by D/C.  Detroit Trust Co., 264

14

Mich. at 267; UAW-GM HR Center, 228 Mich. App. at 491-492.

The concept of "competition" used throughout the MR Agreement plainly relates to motorsport racing competition. The undisputed fact that BDR participated with D/C's business competitor GM in Busch Series racing competition, with's D/C knowledge, but without D/C's objection, is further circumstantial support for concluding that the term "competitor" as used in Section 10.2 was intended to include only D/C's racing competitors as such competitors were anticipated under the MR Agreement. Detroit Trust Co., 264 Mich. at 257; Wonderland Shopping Center, 274 F.3d at 1095. Construing the term "competitor" as applying to all D/C business competitors improperly applies a forced meaning to the term under the MR Agreement as a whole. Detroit Trust Co., 264 Mich. at 257; UAW-GM HR Center, 228 Mich. App. at 491-492; Edgar's Warehouse, Inc. v. United States Fidelity and Guarantee Co., 375 Mich. 598, 602, 134 N.W.2d 746 (1965). D/C's acquiescence to BDR's participation with GM in Busch Series racing does not implicate either Section 27 of the MR Agreement, requiring written waivers of a contractual right, or the legal issue of a waiver of a contractual right under Michigan law, but instead provides circumstantial support for discerning the intent of term "competitor" as used in the MR Agreement. Detroit Trust Co., 264 Mich. at 257. Wonderland Shopping Center, 274 F.3d at 1095. In the absence of evidence that D/C authorized BDR to compete against GM in Busch Series races as "Additional Races" under Sections 1.1 and 3.2, D/C had no contractual right subject to waiver that prevented BDR from racing GM vehicles in Busch Series races.

Turning to the disputed Section 10.2 terms "represent," "endorse," and "promote," that fact that these terms are not expressly defined by the MR Agreement does not render

15

the MR Agreement ambiguous, but instead allows the court to interpret the terms in accordance with their "commonly used meaning." Terrien v. Zwit, 467 Mich. 56, 76, 648 N.W.2d 602 (2002) (quoting Henderson v. State Farm Fire & Casualty Co., 460 Mich. 348, 354, 596 N.W.2d 190 (1999), and Frankenmuth Mutual Ins. Co. v. Masters, 460 Mich. 105, 113-114, 595 N.W.2d 832 (1999)).  The commonly used meaning of these terms must also, of course, be construed in conjunction with the whole MR Agreement.  Detroit Trust Co., 264 Mich. at 257.  Consistent with the court's interpretation of the Section 10.2 term "competitor" as meaning a D/C motorsports racing competitor, the terms "represent," "endorse," and "otherwise promote" as applied in Section 10.2 necessarily speak to "the vehicles, parts or service of" a D/C motorsports racing competitor.  The plain and common meaning of Section 10.2 read as a whole is that "RACE TEAM" and its "Employees" were prohibited from: representing a D/C racing competitor's vehicles, parts, or services; endorsing a D/C racing competitor's vehicles, parts, or services, or; otherwise promoting a D/C competitor's vehicles, parts, or services.  Terrien, 467 Mich. at 76; UAW-GM HR Center, 228 Mich. App. at 491-492.

The terms "represent," "endorse," and "promote" are not technical terms, nor are they words that are used solely in the context of marketing or advertising.  Resort to dictionary definitions, while permissible, Wonderland Shopping Center, 274 F.3d at 1095, is unnecessary because the terms have commonly understood meanings within the context of the circumstances surrounding this case, and the wording of the entire MR Agreement. Each of the terms – "represent," "endorse," and "promote" – are verbs sharing the same subject: "the vehicles, parts or service" of a D/C motorsports racing competitor.  It would be an absurd construction of  Section 10.2 as intending to prohibit BDR from representing,

endorsing, or promoting a D/C racing competitor's vehicles, parts, or services to the *same* racing competitor. Stated differently, Section 10.2 clearly was not intended to prohibit BDR from representing, endorsing, or promoting Toyota vehicles, parts, or services to Toyota. Neither did Section 10.2 prohibit BDR from representing, endorsing, or promoting *BDR's* vehicles, parts, or services to a D/C racing competitor. Section 12.2, addressing the parties duties with respect to confidentiality, places broader restrictions upon BDR, prohibiting BDR from disclosing confidential information "to <u>any other</u> person, firm, corporation, or association, other than to DaimlerChrysler or those designated by DaimlerChrysler." (emphasis added).

Rather, Section 10.2 clearly and unambiguously precluded BDR from representing, endorsing, or otherwise promoting a D/C racing competitor's vehicles, parts, or services to an entity other than that same racing competitor. It follows that BDR's provision of fabricating, engineering, testing, or technical services to a NASCAR participant other than D/C would violate Section 10.2 only if these services were provided to a NASCAR racing competitor of D/C in a manner that could reasonably be viewed as representing, endorsing, or promoting that racing competitor's vehicles, parts, or services to another. BDR's argument that such representations, endorsements, or promotions would also need to be performed in the arena of public advertising and merchandising to constitute a breach of Section 10.2 is not supported by the language of Section 10.2, nor a reading of the MR Agreement as a whole.

Contrary to BDR's argument, Section 10.1 is not rendered superfluous by the court's interpretation of Section 10.2 as including both public and private conduct. Section 10.1 prohibits BDR's "Driver" from driving *any* non-DaimlerChrysler vehicles in any *race show,*

17

*exhibition, or similar event* without D/C's consent, while Section 10.2 prohibits BDR from representing, endorsing, or promoting a D/C *racing competitor's* parts, services, or vehicles. Clearly, Section 10.1 addresses non-competitive events such as a "race show" or "exhibition," as contemplated in Section 7 and Section 7.1.1, preventing the "Driver" from driving any vehicle other than a D/C vehicle in non-competitive events.  Section 10's caption "COMPETITIVE VEHICLES" is "without any substantive effect" by operation of Section 25.3.  In contrast, Section 10.2 prohibits BDR, and BDR's "Driver," from representing, endorsing, or otherwise promoting a D/C racing competitor's parts, services, or vehicle by means beyond driving a D/C racing competitor's vehicle at a non-competitive event.  Thus, while BDR's "Driver" is precluded by Section 10.2 from driving a D/C competitor's vehicle in a manner that represents, endorses, or otherwise promotes that competitor's vehicle, Section 10.1 further precludes BDR's "Driver" from driving a non-competitor's vehicle at a non-competitive event.

The court must give effect to the absence of a comma in the term "race show" as used in Section 10.1, as opposed to creating a new contract prohibiting the "Driver" from driving any non-DaimlerChrysler vehicle in any *"*race[,] show, exhibition, or similar event." The court must enforce the MR Agreement as written.  Wonderland Shopping Center, 274 F.3d at 1092.  The court notes that Section 1.4, defining the term "Performance Driving," contains a similar reference to "dealer shows" when defined as "noncompetitive exhibition or demonstration driving for dealer shows, media presentations and similar events." Further, while a "race show" and "exhibition" are "similar events," it would strain the meaning of Section 10.1 to include a competitive "race" with a non-competitive "show" and "exhibition" as a "similar event."  Detroit Trust Co., 264 Mich. at 257; UAW-GM HR Center,

18

228 Mich. App. at 491-492; Edgar's Warehouse, Inc., 375 Mich. at 602.

The December 30, 1999 MOU proffered by BDR, recognizing that D/C and BDR agreed to form a "NASCAR alliance," does not suggest a different interpretation of Section 10.2. Section 10.2 could not reasonably be construed as intending that BDR was permitted to represent, endorse, or promote the vehicles, parts or services of a D/C racing competitor to others in secrecy, or in forums other than public advertising and merchandising. Detroit Trust Co., 264 Mich. at 257; UAW-GM HR Center, 228 Mich. App. at 491-492; Edgar's Warehouse, Inc., 375 Mich. at 602.

Section 10.2's reference to "RACE TEAM" and "Employees" as being precluded from representing, endorsing, or otherwise promoting D/C racing competitors' vehicles, parts or services is clarified by the MR Agreement's express definitions of the two terms. "RACE TEAM" is expressly deemed to mean "Bill Davis Racing Incorporated" in the preamble, whereas the term "Employees" is defined in Section 1.3 as "the Driver and all employees of the RACE TEAM." The clear language of the MR Agreement at Section 10.2, again by way of substitution, thus prohibits BDR, and all employees of BDR, from representing, endorsing, or otherwise promoting D/C racing competitors' vehicles, parts or services. BDR's argument that the restrictions of Section 10.2 apply only to the "drivers, mechanics and related personnel responsible for" participating in competitive and noncompetitive motorsport events, pursuant to the definition of the lower-case term "Race Team" found in Section 1.6, is not well taken given that the upper-case term "RACE TEAM" as used in Section 10.2 was assigned its own unambiguous definition throughout the MR Agreement: "Bill Davis Racing Incorporated ("RACE TEAM"), a North Carolina company."

Applying Michigan law, this court holds as a matter of law that Section 10.2 of the

19

MR Agreement unambiguously precluded BDR and all BDR employees from representing, endorsing, or otherwise promoting a D/C racing competitor's vehicles, parts, or services to an entity other than that same racing competitor.

### ii. Section 12.1 of the MR Agreement

Section 12.1 of the MR Agreement unambiguously prohibits "RACE TEAM," or BDR, from disclosing to "<u>any other person, firm, corporation, or association whatsoever</u> . . . any design, development, improvement, discovery, invention or any information made, acquired or originated by [BDR] or DaimlerChrysler in connection with this Agreement unless release of such information to a third party is first approved by DaimlerChrysler in writing or such information is released as part of an ongoing project approved by DaimlerChrysler." (emphasis added).  BDR is unambiguously prohibited by Section 12.1 from disclosing the listed information to D/C's racing competitors and non-competitors alike, subject to the exceptions articulated in Section 12.4.  <u>Quality Products</u>, 469 Mich. at 375.

### **B. Application of Undisputed Facts**

### i. Section 10.2 of the MR Agreement

Construing the pleadings and evidence in a light most favorable to D/C consistent with the court's contractual interpretation of the MR Agreement and Section 10.2, BDR is entitled to summary judgment of D/C's breach of contract claim to the extent it is premised on a breach of Section 10.2 because it is beyond dispute that Toyota was not a racing competitor of D/C during the life of the MR Agreement whom BDR was precluded by Section 10.2 from representing, endorsing, or otherwise promoting.  <u>Redding</u>, 241 F.3d at 532; <u>Amway Distributors</u>, 323 F.3d at 390.  D/C admits that Toyota did not compete in Winston Cup Series racing prior to the May 22, 2003 termination of the MR Agreement.

D/C has not come forward with evidence that it expressly authorized BDR, pursuant to Section 1.2 and Section 3.2, to compete in "Additional Races" other than NASCAR Winston Cup Series races.  First Nat'l Bank, 391 U.S. at 270; McLean, 224 F.3d at 800.  Toyota's participation in Craftsman Truck Series races did not make Toyota a racing competitor of D/C, and therefore Section 10.2 did not preclude BDR and BDR's employees from representing, endorsing, or otherwise promoting Toyota's vehicles, parts, or services to others, whether by acquiring a license to conduct business at a North Carolina facility equipped with a Toyota "Tundra Race Truck Center" sign, representing Toyota at the April 30, 2003 wind-tunnel test, wearing a "Toyota Racing Development" shirt, or marketing Toyota trucks at the 2003 Chicago Auto Show and 2003 Daytona 500.  BDR is entitled to summary judgment of D/C's claim of breach of contract premised on a breach of Section 10.2 of the MR Agreement as a matter of law.   Redding, 241 F.3d at 532; Amway Distributors, 323 F.3d at 390.

ii. Section 12.1 of the MR Agreement

As interpreted by the court, Section 12.1 of the MR Agreement is broader in scope than Section 10.2, precluding BDR from disclosing "any design, development, improvement, discovery, invention or any information made, acquired or originated by [BDR] or DaimlerChrysler in connection with" the MR Agreement to "any other person, firm, corporation, or association whatsoever," racing competitors and non-racing competitors alike.  Section 12.1 does not prohibit BDR from providing technical services to Toyota, but it does prohibit BDR from disclosing confidential information to Toyota when providing such services, subject to the exceptions of Section 12.4(a-e).

D/C proffers evidence that BDR provided Toyota with technical information prior to

21

2:03-cv-72265-GCS-DAS   Doc # 75   Filed 07/14/05   Pg 22 of 27   Pg ID 634

the May 22, 2003 termination of the MR Agreement.  BDR Chief Engineer Todd Holbert

testified that, on May 15, 2002, he made a power-point presentation to Toyota regarding

his thoughts on submitting a vehicle for approval to NASCAR.  Holbert May 20, 2004

Deposition, at 77-78.  A slide presented as part of the program read:

> ◇ To this point . . . with the Dodge Intrepid we presented a point from which
> to measure our 'nose kick'.  This point was in an area without a template.
> Later we moved this reference point forward, while not disturbing any
> templates, hence moving our effective nose kick forward worth approximately
> 10% front downforce with minimal drag.

Plaintiff's Exhibit 20.  BDR's Bill Davis testified that BDR acquired this information as a

result of working with D/C's vehicle while D/C was sponsoring BDR.  Davis September 9,

2004 Deposition, at 113.

In an August 20, 2002 e-mail sent from BDR Engineer Terry Elledge to Toyota's

David Currier, and in response to Currier's question regarding "Cylinder pressure data,"

Elledge writes:

> 4.  I will have some cyl. pressure data here tomorrow that was gathered last
> year on a Dodge open engine.  I will forward that to you.  We will be
> instrumenting a [sic] open engine soon here and will make that information
> available to you at that time.

Plaintiff's Exhibit 19.  D/C Engineer Neil Loughlin testified that "[c]ylinder pressure data is

the most sensitive technical performance related data that we have."  Loughlin January 20,

2005 Deposition, at 130.

In a September 10, 2002 e-mail from Toyota's Currier to BDR's Elledge, Currier

refers to data contained within a "P7 Valve pierce point study," states that, according to an

22

earlier e-mail, "the port height on the [D]odge is [x.xx][3]," and asks D/C's Elledge to confirm whether "the latest Dodge configuration" is "Ver 8 or Ver 9?"  Plaintiff's Exhibit 29.  D/C's Loughlin testified that the "P7 Valve pierce point study" was a computer study generated by D/C, and contained the same engineering dimensions as those contained in Currier's e-mail to Elledge.  Loughlin January 20, 2005 Deposition, at 121.  D/C's Loughlin also testified that the "P7 Valve pierce point study" was not "made public," but had only been given to BDR and two other D/C "teams."  Id.  Elledge responded to Currier's e-mail questions in a September 12, 2002 e-mail that "The Ver. 8 was the final design from Dodge," the "projected pierce points were calculated at [x.xxx] as you noted," and "[t]he SB2.2 was measured by Dodge and documented as you noted . . . ."  Id.

In a December 9, 2002 e-mail from BDR's Elledge to Toyota's Currier, Elledge responds to Currier's questions about "restrictor plate development,"[4] stating that BDR purchases the plates from a vendor, manufactured to NASCAR specifications, usually buying 6 plates to "dyno[5] all of them to find the best average for our testing."  Plaintiff's Exhibit 20.  In a follow-up January 7, 2003 e-mail, Currier states that "it would be nice to run one of your Dodge restrictor plate engines on our dyno.  Do you think the Chevy engine

---

[3]  The court substitutes "x"s for actual measurements consistent with the parties exhibits being submitted under seal.

[4]  D/C's Loughlin explains that a "restrictor plate" is "a steel plate that you mount between the carburetor and intake manifold and has four precisely machined holes in it that limits the air flow into the engine and that drops the power level.  NASCAR runs those at their super speedway tracks Daytona and Teladaga to slow the cars down.  Because of that, you have to design, make specific changes to your engine. . . . So it's a very specific thing."  Loughlin January 20, 2005 Deposition, at 153.

[5]  "Dyno testing" is short for dynamometer testing.  A dynamometer measures power output.  The Merriam-Webster Pocket Dictionary (ed. 1975).

23

is good enough that it is not necessary to do this?  Would you be comfortable loaning an engine just for running a couple power runs on our dyno?"  Plaintiff's Exhibit 21.  Elledge responds that the "Chevy engine is fairly close to current designs, and would be certainly be [sic] acceptable to begin development," but "[a] comparison at a later date would be a great idea."  Id.

Construing the evidence proffered by D/C in a light most favorable to BDR, a question of fact remains whether D/C's disclosure to Toyota of "nose kick" information, cylinder pressure data, "P7 Valve pierce point study" information such as "projected pierce points," and restrictor plate data, constituted a disclosure of confidential information and a breach of Section 12.1, or whether these and other disclosures fell within an exception of Section 12.4.  Matsushita Elec., 475 U.S. at 587; First Nat'l Bank, 391 U.S. at 270; Amway Distributors, 323 F.3d at 390; Redding, 241 F.3d at 532; McLean, 224 F.3d at 800.  BDR has come forward with its own evidence that the "nose kick" information presented by BDR's Holbert to Toyota on May 15, 2002 was publicly known as early as July 27, 2001 through no wrongful act of BDR, and thus exempt from non-disclosure by operation of Section 12.4(e).  See Defendant's Exhibit 26.  With respect to the engine cylinder pressure data, the "P7 Valve pierce point study," the calculated "pierce points," and restrictor plate information, BDR proffers D/C's Loughlin's testimony that NASCAR Rules require parts to be made available for inspection[6], and that the "pierce point" information was measured by

---

[6]  Loughlin testified by way of example that D/C examined a Chevy engine, and incorporated a manifold design on top of the engine to take the water out of the engine system.  "Our previous engine design was two pieces.  They had integrated it into one piece and we thought that was rather clever, so we used that concept when we designed the new engine."  Loughlin January 20, 2005 Deposition, at 30.

NASCAR and indeed documented in a NASCAR Rule Book.  See Loughlin January 20,
2005 Deposition, at 95, 123.  The MR Agreement manifests the parties' clear intent to
participate in racing as sanctioned by NASCAR.  Further, the August 20, 2002 e-mail does
not establish beyond dispute that Elledge in fact forwarded cylinder pressure data to Currier
the next day, or that the soon to be gathered "open engine" information was ever passed
on to Currier.  The December 9, 2003 and January 7, 2003 e-mails, read in a light most
favorable to BDR, tend to show that D/C's Elledge suggested to BDR's Currier that running
a "dyno" test on a Chevy engine would be "acceptable to begin development," and that a
later comparison of Dodge and Chevy engine tests "would be a great idea," leaving open
the issues of whether BDR ever provided Toyota with a Dodge engine, and whether the
engine was provided in breach of Section 12.1.  The record before the court does not
establish beyond dispute that BDR breached the confidentiality requirements of the MR
Agreement.  That ultimate issue of fact must be decided by a jury.  Amway Distributors, 323
F.3d at 390; Redding, 241 F.3d at 532.  It follows that, construing the same evidence in a
light most favorable to D/C, BDR is likewise not entitled to dismissal of D/C's claim of
breach of contract premised on a breach of Section 12.1, or D/C's claim for injunctive relief.
Id.

In closing, the court notes that BDR appears to argue that D/C has not claimed that
BDR breached the MR Agreement by disclosing confidential information prior to termination
of the MR Agreement on May 22, 2003.  D/C alleges in its complaint, as part of its
"GENERAL ALLEGATIONS", that:

> 10.   RACE TEAM agreed that it would not disclose "any design,
> development, improvement, discovery, invention or any information made,
> acquired or originated by RACE TEAM or DaimlerChrysler in connection with

25

this Agreement unless release of such information to a third party is first approved by DaimlerChrysler in writing. . . ."  See Agreement, § 12.1.

Complaint, ¶ 20, at 3.  In its Count II "BREACH OF CONTRACT" claim, D/C alleges:

29.  Plaintiff hereby incorporates the preceding paragraphs as though fully set forth herein.

30.  Defendant's conduct constitutes a breach of the Agreement.

Id., ¶¶ 29-30, at 5.  D/C has expressly alleged that BDR breached the MR Agreement by disclosing information contrary to Section 12.4.  BDR's argument that D/C has not alleged such a claim is not well taken.

The court also notes that D/C has not moved for summary judgment of its claim for injunctive relief.  Consistent with the analysis herein, it remains possible for D/C to prove that it is entitled to injunctive relief; BDR is not entitled to summary judgment of D/C's claim for injunctive relief, as argued, based on either a lack of evidence that BDR disclosed information in violation of Section 12.1, or D/C's inability to prove its remaining breach of contract claim.  BDR has not proffered authority to support its position that, under Michigan law, a contracting party cannot prevail on a breach of contract claim premised on conduct that occurred prior to contract termination of which that party was unaware.  See Bradley v. Philip Morris, Inc, 194 Mich.App 44, 48; 486 NW2d 48 (1991), aff'd after remand 444 Mich. 634 (1994) (holding that employer may lawfully terminate contract for just cause based on circumstances that existed prior to termination but were unknown to the employer).  BDR is not entitled to summary judgment based on its argument that D/C first discovered the alleged disclosure of confidential information after this lawsuit commenced and the MR agreement was terminated on May 22, 2003.

## VI.  Conclusion

26

Plaintiff D/C's motion for partial summary judgment is hereby DENIED.  Defendant BDR's motion for summary judgment is hereby GRANTED, IN PART, to the extent D/C's breach of contract claim is premised upon a breach of Section 10.2 of the parties' February 14, 2000 Motorsport Racing Agreement.  D/C's breach of contract claim premised on a breach of Section 10.2 of the MR Agreement is hereby DISMISSED.  BDR's motion for summary judgment is hereby DENIED, IN PART, as to D/C's remaining breach of contract claim premised upon a breach of Section 12.1 of the MR Agreement, D/C's claim for injunctive relief, and BDR's counterclaim of breach of contract.  This case proceeds to trial on D/C's breach of contract claim premised on Section 12.1, D/C's claim for injunctive relief, and BDR's counterclaim that D/C breached the MR Agreement by terminating the contract on May 22, 2003.

SO ORDERED.

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

Dated:  July 14, 2005

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record on July 14, 2005, by electronic and/or ordinary mail.

s/Josephine Chaffee
Secretary/Deputy Clerk

27